**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TOP TOBACCO, L.P. and REPUBLIC TOBACCO L.P., | )<br>)<br>) |
| Plaintiffs, | )<br>)<br>) |
| vs. | ) Case No. 06 C 950<br>) |
| NORTH ATLANTIC OPERATING COMPANY, INC. and NATIONAL TOBACCO COMPANY L.P., | )<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Top Tobacco, L.P. and Republic Tobacco L.P. (together, Top Tobacco), owners of the trademark TOP for tobacco products, have sued North Atlantic Operating Company, Inc. and National Tobacco Company L.P. (together, North Atlantic) for trademark infringement, unfair competition, and dilution under the Lanham Act, and related state law claims arising out of North Atlantic's use of the phrase "Fresh-Top Canister" on one of its tobacco products. North Atlantic has moved for summary judgment on each count of Top Tobacco's complaint. For the following reasons, the Court grants the motions.

### Facts

Because North Atlantic has moved for summary judgment, the Court views the facts in the light most favorable to Top Tobacco and draws reasonable inferences in its favor. *See DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987).

Top Tobacco and North Atlantic are major players in the "roll-your-own" or "make-your-

own" (MYO) cigarette market. Top Tobacco's predecessors have been using the TOP trademark to brand MYO cigarette tobacco for approximately one hundred years, and for cigarette rolling papers for approximately sixty years. Top Tobacco has four federal trademark registrations for marks using the word "top" or a picture of a toy top: registration number 2,229,958, issued on November 23, 1999, is for a "spinning top" design mark used in conjunction with smoking tobacco; registration number 2,739,465, issued on July 22, 2003, is for a "spinning top" design mark used in conjunction with cigarette rolling papers; registration number 2,739,466, issued on July 22, 2003, is for the TOP word mark used in conjunction with smoking tobacco; and registration number 2,831,105, issued on April 13, 2004, is for the TOP word mark used in conjunction with cigarette rolling papers.

Other companies also use the word "top" in conjunction with tobacco-related products. As Top Tobacco told the United States Patent and Trademark Office (USPTO) in response to the USPTO's initial refusal to register the TOP mark in 2002:

> Here there are not only 13 Cited Marks which incorporate the term "TOP," but an online search of the Trademark Office's records using the TESS system on May 10, 2002, revealed no less than 2,360 live applications and registrations comprised of "TOP." The overwhelming frequency of applications and registrations comprised of "TOP" in the Trademark Office's records coupled with the longstanding coexistence of the Cited Marks, all in Class 34, demonstrates the Trademark Office's recognition that the scope of protection that should be afforded to these marks is *extremely* narrow. The fact that the Trademark Office has granted coexisting registrations for TOP STONE and TOP VALUE, both for cigars . . ., and TOPCO and TOPS, both for book matches . . . further bolsters this point.

Def.'s Ex. C at 3 (emphasis in original).[1] In addition, Swisher sells snuff under the brand TOPS,

---

[1] Class 34, as used in the quoted passage, includes "tobacco, smokers' articles, and matches."

and Philip Morris has registered the mark FLIP-TOP BOX for use on packages of Marlboro cigarettes. There do not appear, however, to be any other registrants of the word "top" in the MYO tobacco market.

Top Tobacco sells MYO tobacco under the TOP brand. Its six ounce canisters are yellow, and the TOP brand is prominently displayed in blue on the front of the canister. Underneath the word TOP is a red, white, and blue "spinning top." Its canister looks like this:



North Atlantic sells MYO tobacco under the ZIG-ZAG brand. In 2001, it began affixing the phrase "Fresh-Top Canister" to the front of its five ounce canisters of cigarette tobacco. It claims common law trademark rights in the word "Fresh-Top." The canisters are red and white. The phrase "Fresh-Top Canister" appeared below a registered design of a nineteenth century Zouave[2] flanked by tobacco leaves, the ZIG-ZAG mark, and the phrase CLASSIC AMERICAN

---

[2] A Zouave is a soldier in a particular French infantry unit that originated in Algeria in 1831. According to legend, while fighting in the 1854-55 Siege of Sevastopol during the Crimean War, an unlucky Zouave had his clay pipe broken by a bullet. Determined to smoke anyway, the Zouave rolled tobacco in a piece of paper torn from his bag of gunpowder. The cigarette was born. *See* Zig-Zag History, http://www.zigzag.com/about_History.htm. The French expression "faire le zouave" can be translated roughly as "to play the fool." The term,
(continued...)

BLEND. The phrase "Fresh-Top Canister" was many times smaller than these other logos and phrases. In 2004, North Atlantic changed the design of its canister, made the phrase "Fresh-Top Canister" even smaller, and moved it to the side of the canister. Its 2001 and 2004 canisters look like this:

 

**Discussion**

When a district court rules on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Entry of summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

**A.      Infringement and unfair competition claims**

---

[2](...continued)
dating back to the nineteenth century, appears to reflect the popular image of the French Zouaves as devil-may-care risk takers – an apt descriptor for the person who apparently first decided to smoke a cigarette.

Top Tobacco has brought four claims based on North Atlantic's alleged trademark infringement: a claim under the Lanham Act for infringement of a registered trademark (Count 1), a Lanham Act unfair competition claim, which amounts to a claim for infringement of an unregistered trademark (Count 3), a claim under the Illinois Deceptive Trade Practices Act (Count 4), and a claim of state law unfair competition (Count 5). The analysis of Top Tobacco's state law claims will track that of the Lanham Act claims. *See, e.g., Rust Env't & Infrastructure, Inc. v. Teunnissen*, 131 F.3d 1210, 1219 (7th Cir. 1997) (plaintiff could not prevail on state law unfair competition claim if no likelihood of confusion); *World Impressions, Inc. v. McDonald's Corp.*, 235 F. Supp. 2d 831, 841 (N.D. Ill. 2002) (common law trademark infringement and unfair competition claims are resolved in the same manner as Lanham Act claims); *S. Indus., Inc. v. Stone Age Equip., Inc.*, 12 F. Supp. 2d 796, 819 (N.D. Ill. 1998) (granting summary judgment on federal trademark infringement claim and Illinois Deceptive Trade Practices Act claim). Therefore, the Court will focus its attention on Top Tobacco's Lanham Act claims.

To prevail on its Lanham Act claims, Top Tobacco must first show that it had trademark rights in its TOP mark before North Atlantic began using the allegedly infringing "Fresh-Top Canister" phrase in December 2001. *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 818-19 (7th Cir. 2002); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980). If it can establish such rights, Top Tobacco must then prove that it is likely consumers would be confused about the identity or source of North Atlantic's product by its use of the term "Fresh-Top Canister." *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 911-12 (7th Cir. 1996); *August Storck K.G. v. Nabisco*, 59 F.3d 616, 619 (7th Cir. 1995) (likelihood of confusion is required, not just possibility of confusion).

5

The Court will focus on the second factor, as it is dispositive of Top Tobacco's infringement and unfair competition claims. To prevail on these claims, Top Tobacco must show that the challenged mark is likely to confuse consumers. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043 (7th Cir. 2000). Although likelihood of confusion is a question of fact, the issue may be resolved on summary judgment where the evidence is "so one-sided that there can be no doubt about how the question should be answered." *Door Systems, Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996) (affirming summary judgment for defendant where there was "no reasonable likelihood that any significant number of consumers could mistake the defendant for the plaintiff."). This is such a case.

Courts consider seven factors to determine whether there is a likelihood of confusion: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to 'palm off his product as that of another.'" *Barbecue Marx*, 235 F.3d at 1043-44 (citations omitted). Though no single factor is dispositive, three of the factors are of particular importance: the similarity of the marks, the defendant's intent, and actual confusion. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000). The Court, therefore, will begin its analysis by examining these three factors.

   1.   **Similarity of marks**

There is no dispute that both parties' marks include the word "top." To determine whether the marks are similar, however, the Court must consider the visual characteristics of each mark. *Barbecue Marx*, 235 F.3d at 1044; *see also Duluth News-Tribune v. Mesabi*

*Publishing Co.*, 84 F.3d 1093, 1097 (8th Cir. 1996) ("The use of dominant identical words in common does not mean the two marks are similar. Rather than consider the similarities between the component parts of the marks, we must evaluate the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by the purchasers of such products.") (citation omitted).

In this case, the two marks utilizing the word "top" are presented on similarly-sized canisters of MYO tobacco. Apart from that, there really is nothing similar about their appearance. The North Atlantic canister is white and red with three marks prominently emblazoned on the front: a bust of a Zouave flanked by tobacco leaves, the phrase ZIG-ZAG, and the slogan CLASSIC AMERICAN BLEND. The phrase "Fresh-Top Canister" is several orders of magnitude smaller than these other elements. It is placed below the other elements in the 2001 design and on the side of the canister in the 2004 design. The Top Tobacco canister, on the other hand, is bright yellow. The word TOP is prominently displayed across the top front of the canister in blue. Immediately below the word TOP is a red, white, and blue "spinning top." Below the word TOP and spinning top design, the words "Cigarette Tobacco" are displayed in red.

The Seventh Circuit made clear in *Barbecue Marx* that the visual appearance of the marks is crucial to determining whether the marks are confusingly similar. In that case, the marks at issue were used by Chicago barbecue restaurants. Even though, as the court noted, the marks BONE DADDY and SMOKE DADDY sound similar, "SMOKE DADDY'S rectangular mark depicts the words 'SMOKE DADDY' on top of a pair of wings and smoke. In contrast, BONE DADDY'S mark prominently displays a pig clad like a gangster and the words 'BONE

7

DADDY.'" *Barbecue Marx*, 235 F.3d at 1044. The visual presentation of the parties' marks in this case is likewise quite different, as the Court has described. In addition, the prominent display of North Atlantic's other marks on the canister reduces any possibility of confusion. *Ziebart Int'l Corp. v. After Market Assoc.*, 802 F.2d 220, 227 (7th Cir. 1986) ("Prominent display of different names on the marks . . . reduce[s] the likelihood of confusion even where . . . the marks are otherwise similar").

When viewed in the context in which consumers see them, the TOP and "Fresh-Top Canister" marks are visually distinct and, therefore, not similar in appearance. No reasonable jury could find otherwise.

The lack of similarity between the marks weighs heavily in favor of North Atlantic. This is particularly true with regard to North Atlantic's current canister, which has been in use since 2004: a consumer looking at a store shelf of tobacco products would not even see the phrase "Fresh-Top Canister" on the ZIG-ZAG product unless he picked it up and turned it ninety degrees to the right.

The Court actually could have dispensed with the foregoing analysis: Top Tobacco previously undertook the same analysis and argued *for* the same conclusion reached by the Court. In 2001, the USPTO examiner refused Top Tobacco's proposed registration for TOP because, he reasoned, the tobacco field was crowded with other registrants who utilized "top." In its motion for reconsideration, Top Tobacco told the USPTO, among other things, that the other marks that incorporated the word "top" were not similar to its mark because "the evaluation of whether marks are confusingly similar is dependent upon a comparison of the marks in their entireties . . . . [T]he Examiner may have been improperly focused upon the fact

8

that each of the Cited Marks contains the term TOP, rather than focusing upon the overall commercial impression of the respective marks." In addition, Top Tobacco argued that its "TOP mark connotes a toy top," while

> none of the Cited Marks employ the term "TOP" in the same or even a similar fashion. They either use "TOP" as a superlative describing their product as "the best" or "above all others" *or to refer to a lid or closure*. Accordingly, these differing commercial impressions *weigh strongly in favor of a finding of no likelihood of confusion* and further merit reconsideration of the Examiner's final refusal.

Def.'s Ex. C at 7 (emphasis added). That example *is* this case. North Atlantic only uses the mark "Fresh-Top" along with the word "canister." It does this because the canister has an aluminum "pop-top" closure that keeps the product sealed until opened by the consumer. Def.'s Ex. A at ¶¶ 5-7. Based on Top Tobacco's own argument to the USPTO, use of "Fresh-Top" in this context would not lead to a likelihood of confusion with the TOP mark.

### 2. North Atlantic's intent

Top Tobacco claims that the following facts show that North Atlantic adopted the "Fresh-Top" mark to confuse consumers: (1) North Atlantic monitors competitive activity in the MYO cigarette market; (2) North Atlantic utilized A.C. Nielsen data to monitor Top Tobacco's sales; and (3) before it adopted the Fresh-Top mark, North Atlantic knew of Top Tobacco's use of the TOP mark and that Top Tobacco was one of the largest selling brands of MYO cigarette tobacco. Pl.'s Resp. at 18.

Top Tobacco cites several cases from circuits other than the Seventh Circuit and one district court case to support its position that North Atlantic's awareness of the TOP mark before it adopted "Fresh-Top Canister" is sufficient to raise a material issue of fact. Seventh Circuit precedent, however, does not support Top Tobacco's position. In *Packman v. Chicago Tribune*

9

*Co.*, 267 F.3d 628, 644 (7th Cir. 2001), the court held that defendant's knowledge of plaintiff's mark before adopting the alleged infringing mark did not show fraudulent intent, particularly in light of the visually distinct appearance of defendant's use of the mark. In *Barbecue Marx*, the court held that defendant's admission that he considered that the name of his soon-to-be-opened restaurant was similar to the name of plaintiff's restaurant was not enough to show intent in light of the other evidence. *Barbecue Marx*, 235 F.3d at 1046. The court noted that evidence in the record showed that defendant derived inspiration for the name "Bone Daddy" from something other than plaintiff's "Smoke Daddy" restaurant. In addition, the court took into account that another restaurant owned by the defendant had a similar "irreverent" style to the proposed "Bone Daddy" restaurant that differentiated it from "Smoke Daddy."

In this case, the circumstances of North Atlantic's adoption of "Fresh-Top Canister" do not support a showing of fraudulent intent. North Atlantic only uses "Fresh-Top Canister" on canisters of tobacco that have a particular seal on the top that is designed to ensure freshness. It has not utilized the phrase "Fresh-Top" on any of its other products. In 2004, North Atlantic redesigned its canisters and moved the "Fresh-Top Canister" phrase to the side of the canister. Even when the phrase appeared on the front of the canister, it was one of the least noticeable elements on the label. It was many times smaller than ZIG-ZAG, CLASSIC AMERICAN BLEND, and the bust of the Zouave flanked by tobacco leaves. These facts are simply inconsistent with a party attempting to palm off its goods as those of a competitor. This factor weighs in favor of North Atlantic.

### 3. Actual confusion

The third factor that is given particular importance is evidence of actual confusion.

Though evidence of actual confusion is not required, "a finding of likely confusion can no more be based on pure conjecture or a fetching narrative alone than any other finding on an issue on which the proponent bears the burden of proof." *Libman Co. v. Vining Industries, Inc.*, 69 F.3d 1360, 1363 (7th Cir. 1995) (discussing importance of evidence of actual confusion). Although Top Tobacco and North Atlantic's MYO tobacco canisters have co-existed on the same store shelves since 2001, Top Tobacco admits that it has no evidence of actual confusion. As the Seventh Circuit has stated, "if confusion were likely, one would expect . . . [plaintiffs] to have been able to find one such confused person." *Id.* at 1361. *See also Brookfield Comm. Inc. v. West Coast Entertain. Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999) ("We cannot think of more persuasive evidence that there is no likelihood of confusion between these two marks than the fact that they have been simultaneously used for five years without causing any consumers to be confused as to who makes what.").

Nor did Top Tobacco commission a survey of consumers to determine whether the marks were likely to cause confusion. Though not dispositive, the Seventh Circuit has recognized the potential importance of this tool to trademark infringement plaintiffs. *See Barbecue Marx*, 235 F.3d at 1046 (plaintiff "could have conducted a survey . . . asking would-be consumers to compare the two restaurants."). Top Tobacco does not address in its response brief why it failed to conduct a consumer survey or put forth any evidence of actual confusion. It merely states that "this factor cannot mandate summary judgment." Pl.'s Resp. at 17. Top Tobacco is correct that this factor alone does not mandate summary judgment. The absence of any evidence of actual confusion, however, means that this factor weighs in favor of North Atlantic.

### 4. Similarity of products, area and manner of concurrent use, and degree of care

Both marks are used on similarly sized and shaped canisters of MYO tobacco that are sold through the same retail channels. These factors weigh in favor of Top Tobacco. As for the degree of care exercised by consumers, neither party points to any evidence in the record to help the Court weigh this factor. North Atlantic argues that tobacco products are somewhere in between a candy bar and an automobile on the scale of consumer purchases and the degree of care likely to be exercised. Perhaps so, but that range is too broad to be much help. For its part, Top Tobacco claims that this factor is irrelevant. The Court concludes that the degree of care exercised by consumers does not favor either side.

### 5. Strength of TOP mark

The final factor the Court must consider is the strength of Top Tobacco's TOP mark. Top Tobacco contends that its mark's strength is evidenced by the commercial strength of its product and the fact that TOP is an arbitrary mark when used in connection with tobacco. North Atlantic notes, however, that in a proceeding before the USPTO appealing the Examiner's refusal to register the TOP mark, Top Tobacco made the following statement (which the Court also quoted earlier):

> Here there are not only 13 Cited Marks which incorporate the term "TOP," but an online search of the Trademark Office's records using the TESS system on May 10, 2002, revealed no less than 2,360 live applications and registrations comprised of "TOP." The overwhelming frequency of applications and registrations comprised of "TOP" in the Trademark Office's records coupled with the longstanding coexistence of the Cited Marks, all in Class 34, demonstrates the Trademark Office's recognition that the scope of protection that should be afforded to these marks is *extremely* narrow. The fact that the Trademark Office has granted coexisting registrations for TOP STONE and TOP VALUE, both for cigars . . ., and TOPCO and TOPS, both for book matches . . . further bolsters this point.

Def.'s Ex. C at 3 (emphasis in original). Top Tobacco also told the USPTO that "where the Cited Marks exist in an extremely crowded field, the marks in question should be entitled to a comparably narrow scope of protection." *Id.* at 2. It continued,

> [t]hus, marks like the Cited Marks which incorporate very common terms such as TOP are entitled to only a very narrow scope of protection, and the addition of any matter which could distinguish one mark from another in sight, sound or meaning, or a slight difference in the goods and services with which the respective marks are used should be sufficient to distinguish one mark from the next for the purposes of avoiding consumer confusion.

*Id.* at 3.

Top Tobacco cannot have it both ways. It cannot argue to the USPTO that marks that include the word "top" for tobacco products are weak because the term is "common" and then argue before this Court that its TOP mark is strong. It certainly cannot do so without providing some evidence that consumers recognize its mark, associate it with Top Tobacco's MYO tobacco product, or purchase the product because of it. Having failed to put forth any such evidence, and in light of its concessions before the USPTO, the Court finds that this factor weighs in favor of North Atlantic.

### 6. Conclusion

No reasonable jury could find that North Atlantic's use of the phrase "Fresh-Top Canister" causes a likelihood of confusion. The marks are not similar as viewed by consumers: North Atlantic's use of "Fresh-Top Canister" is dominated by three house marks, the phrase "Fresh-Top Canister" is anything but prominent, and the canisters are contrasting colors. Since 2004, the mark has been relegated to a relatively unimportant position on the side of North Atlantic's canister. Top Tobacco has put forth no evidence of actual confusion despite North Atlantic's use of the allegedly infringing mark for almost five years. There is no evidence that

13

North Atlantic began using the mark in an effort to pass off its products as those of Top Tobacco. Finally, the TOP mark is not particularly strong. As Top Tobacco told the USPTO, there are many other users of the word "top" in the tobacco market, and a use of "top" that refers to a lid or closure is unlikely to be confused with the TOP mark. The Court grants summary judgment in North Atlantic's favor on Top Tobacco's infringement and related claims (Counts 1, 3, 4, and 5).

**B.    Dilution**

To prevail on its dilution claim under 15 U.S.C. § 1125(c), Top Tobacco must show that (1) the TOP mark is famous; (2) North Atlantic adopted the "Fresh-Top Canister" slogan after the TOP mark became famous; (3) North Atlantic diluted the TOP mark; and (4) North Atlantic's use is commercial and in commerce. *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 432-33 (2003); *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 639 (7th Cir. 1999).[3]

Top Tobacco's dilution claim starts and ends with the threshold requirement that the TOP mark be famous. Among the factors courts may consider when determining whether a mark is famous are the mark's inherent or acquired distinctiveness, the duration and extent of the mark's use, advertising and publicity of the mark, the scope of the geographical trading area in which the plaintiff sells the goods, the degree of recognition in the trading channels used by the senior and junior users, the nature and extent of the same or similar third-party marks, and whether the mark was registered. 15 U.S.C. § 1125(c)(1); *Syndicate Sales*, 192 F.3d at 639.

---

[3] The parties agree that the amendments to 15 U.S.C. § 1125 adopted in October 2006 do not apply to Top Tobacco's dilution claim.

It is not easy for a mark to qualify for dilution protection. Rather, the dilution statute "is to be applied selectively and is intended to provide protection only to those marks which are both distinctive and famous . . . [T]he new dilution provisions should apply only to those very unique marks which qualify for dilution protection in light of all the factors which are weighed by the court." Senate Judiciary Committee Report on S. 1883, S. Rep. No. 100-515, at 41-42 (Sept. 15, 1988). Courts routinely hold that a mark must be truly prominent and renowned before it is entitled to protection under the dilution statute. *See, e.g., Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) ("Dilution is a cause of action invented and reserved for a select class of marks"); *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002) ("[T]he mark must be a household name . . . [F]amousness is . . . a hard standard to achieve."); *Everest Capital Ltd. v. Everest Funds Management, L.L.C.*, 393 F.3d 755, 763 (8th Cir. 2005) ("The judicial consensus is that 'famous' is a rigorous standard.").

In this case, the relative weakness of the TOP mark, the vast number of similar third-party marks in the tobacco market, and Top Tobacco's admission that marks using the word "top" are weak necessitate a finding that, as a matter of law, the TOP mark is not famous. As Top Tobacco told the USPTO, "[t]he overwhelming frequency of applications and registrations comprised of 'TOP' in the Trademark Office's records coupled with the longstanding coexistence of the Cited Marks, all in Class 34, demonstrates the Trademark Office's recognition that the scope of protection that should be afforded to these marks is *extremely* narrow." Def.'s Ex. C at 3 (emphasis in original). Top Tobacco also acknowledged that its mark and the marks the USPTO cited as impediments to registration for TOP "exist in an extremely crowded field" and therefore "should only be entitled to a comparably narrow scope of protection." Top

15

Tobacco is stuck with these admissions. *See Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427-28 (7th Cir. 1993) ("A litigant is forbidden to obtain a victory on one ground and then repudiate that ground in a different case in order to win a second victory.").

As the Ninth Circuit has said in denying dilution protection to the mark FRUIT,

> if "FRUIT" by itself fell within the protected domain, it could be protected under the Anti-dilution statute against all users, not merely those in competition with [Fruit of the Loom]. The humble, humdrum word FRUIT would be barred from use by the Fruit Basket, The Fruit Gallery, and Fruit King, to name only three businesses currently listed in the San Francisco telephone directory. [Fruit of the Loom] would sweep clean the many business uses of this quotidian word.

*Fruit of the Loom, Inc. v. Girouard*, 994 F.2d 1359, 1363 (9th Cir. 1993). The same rationale applies to the mark TOP. Top Tobacco's TOP mark cannot be considered famous within the meaning of the anti-dilution statute, given the dozens of other users of "top" in the tobacco category, among them TOPS snuff, TIP TOP cigarette rolling papers, TOP SCORE cigarettes, FLIP-TOP BOX for cigarette packaging, TOP VALUE cigars, TOP VALUE pipe tobacco, TOP LEAF chewing tobacco, and TOP HAT cigars.

Top Tobacco counters that it is the only user of "top" in the MYO tobacco market. This argument is of no avail. If there were no other users of "top" in the entire tobacco market, the fact that there is a TOP electricity generator, RED TOP drill bit, or TOP POWER garment bag might not, by itself, undermine Top Tobacco's dilution claim.[4] *But see Nissan Motor Co. v. Nissan Computer Co.*, 378 F.3d 1002, 1013-14 (9th Cir. 2004) ("when 'a mark is in widespread use, it may not be famous for the goods or services of one business.'") (citation omitted). But that is not the case. TOP MYO tobacco is displayed alongside products such as TOPS snuff and

---

[4] USPTO serial numbers 79003640, 78757602, and 79018847, respectively.

16

TOP VALUE pipe tobacco. Third party marks such as these unquestionably have an impact on the distinctiveness of the TOP mark sufficient to preclude a reasonable jury from finding that the mark is famous within the meaning of § 1125(c). *See Playboy Enterprises Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1028 n. 33 (9th Cir. 2004) ("Evidence of third-party use in markets similar to the markholder's is more compelling than evidence of third-party use in unrelated markets."). The Court grants summary judgment in favor of North Atlantic on Top Tobacco's dilution claim (Count 2).

## Conclusion

For the reasons stated above, the Court grants defendants' motions for summary judgment [docket nos. 58 and 61]. The Clerk is ordered to enter judgment in favor of the defendants. The trial date of March 12, 2007 and the final pretrial conference date of February 28, 2007 are vacated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: January 4, 2007