**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **TOP TOBACCO, L.P. and REPUBLIC TOBACCO L.P.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| ) | |
| **vs.** ) | **Case No. 06 C 950** |
| ) | |
| **NORTH ATLANTIC OPERATING COMPANY, INC. and NATIONAL TOBACCO COMPANY L.P.,** ) | |
| ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

On January 4, 2007, the Court granted North Atlantic Operating Company, Inc. and

National Tobacco Company L.P.'s (together, North Atlantic) motion for summary judgment

against Top Tobacco, L.P. and Republic Tobacco L.P. (together, Top Tobacco).  North Atlantic

has moved for an award of attorneys' fees under the Lanham Act, 15 U.S.C. § 1117(a), which

authorizes an award of reasonable attorneys' fees to the prevailing party in "exceptional cases."

It has also submitted a bill of costs pursuant to 28 U.S.C. § 1920 and Federal Rule of Civil

Procedure 26(b)(4)(C)(i).  Top Tobacco contends that North Atlantic is not entitled to attorneys'

fees and that its bill of costs should be reduced significantly.  For the following reasons, the

Court grants defendants' motion for attorneys' fees, and grants in part and denies in part their

bill of costs.

**Discussion**

1. **Attorneys' fees**

The facts of this case are fully set forth in the Court's January 4, 2007 Memorandum

Opinion and Order. *Top Tobacco, L.P. v. North Atlantic Operating Co., Inc.*, No. 06 C 950,

2006 WL 118527 (N.D. Ill. Jan. 4, 2007). Top Tobacco and North Atlantic both manufacture

and sell roll-your-own (RYO) cigarette tobacco and rolling papers. Top Tobacco sells its

products under the TOP brand, and North Atlantic sells it products under the ZIG-ZAG brand.

Top Tobacco brought five claims based on North Atlantic's use of "Fresh-Top Canister": a claim

under the Lanham Act for infringement of a registered trademark (Count 1), a federal dilution

claim (Count 2), a Lanham Act unfair competition claim, which amounts to a claim for

infringement of an unregistered trademark (Count 3), a claim for violation of the Illinois

Consumer Fraud and Deceptive Trade Practices Act (ICFA) (Count 4), and a state law unfair

competition claim (Count 5). The Court granted summary judgment in favor of North Atlantic

on all counts.

Under the Lanham Act and ICFA, a court may award reasonable attorneys' fees to a

prevailing party if the losing party's conduct can be regarded as oppressive. 15 U.S.C. §

1117(a); 815 ILCS 505/10a(c); *Door Sys., Inc. v. Pro-Line Sys., Inc.*, 126 F.3d 1028, 1029-30,

1032 (7th Cir. 1997) (citations omitted). The Seventh Circuit has held that a suit is oppressive if

"it lacked merit, had elements of an abuse of process claim, and plaintiff's conduct unreasonably

increased the cost of defending against the suit." *S Indus., Inc. v. Centra 2000, Inc.*, 249 F.3d

625, 627 (7th Cir. 2001). A case, however, can be exceptional and fees may be awarded "simply

on the basis that it is wholly lacking in merit." *Id.* at 626 ("[t]his was not a murky case. Based

solely on the weakness of S Industries' claims, Judge Lindberg acted well within his discretion in granting attorneys['] fees."); *Bretford Mfg., Inc. v. Smith Sys. Mfg. Co.*, 389 F. Supp. 2d 983, 984 (N.D. Ill. 2005).

North Atlantic argues that this case is exceptional for several reasons. First, it contends that Top Tobacco's claims were extremely weak and that it failed to produce any evidence of a likelihood of confusion. Second, North Atlantic points to Top Tobacco's decision to seek a preliminary injunction and over ten million dollars in damages for the alleged infringement, requiring defendants to defend themselves with "expedited vigor" that resulted in substantial costs. Finally, and most importantly in the Court's view, North Atlantic cites to Top Tobacco's 2002 representations to the United States Patent & Trademark Office (USPTO) when it was attempting to register the TOP mark.

### a. Strength of Top Tobacco's claims

*S Industries* holds that this case may be deemed exceptional "based solely on the weakness of [Top Tobacco's] claims." *S Indus.*, 249 F.3d at 626. Top Tobacco's infringement and dilution claims were exceptionally weak. Without rehashing the lengthy analysis in the Court's January 4, 2007 memorandum opinion and order, a simple look at the canisters as they appeared on store shelves shows the virtual impossibility that consumers would be confused by North Atlantic's use of the phrase "Fresh-Top Canister":




Moreover, North Atlantic removed the "Fresh-Top Canister" designation from the front of its product years before Top Tobacco filed this suit. By 2004, a consumer would have had to pick up the ZIG-ZAG product and turn it ninety degrees to the right even to see the words "Fresh-Top Canister." Given these considerations, it is not surprising that Top Tobacco did not come forth with any evidence of actual confusion despite North Atlantic's use of "Fresh-Top Canister" on one of its products for over five years.

Top Tobacco argues that, in addition to the canisters, certain North Atlantic price lists identified one of the ZIG-ZAG products as a "Fresh-Top Canister." Top Tobacco's contention that this was likely to confuse wholesale customers regarding the source of ZIG-ZAG MYO tobacco is unavailing. The price list was given only to wholesalers who purchased by the case and, it is fair to infer, took far greater care in purchasing products than ordinary retail consumers. In addition, the price lists all clearly identified the product as ZIG-ZAG. Some of the price lists even had the ZIG-ZAG logo emblazoned on the top of the list. Based on these facts, it is inconceivable that a wholesaler, whose business is purchasing tobacco, would confuse two of the largest players in the MYO market. Moreover, even in the extremely unlikely event that a wholesaler thought he was purchasing a TOP product instead of a ZIG-ZAG product, he would be set straight when a case of ZIG-ZAG canisters that looked nothing like the TOP canisters arrived. Top Tobacco's suggestion that wholesalers may never see the canisters because they are packed in cases, Pl.'s Resp. at 6, is pure conjecture on the present record.

Even more importantly, however, North Atlantic stopped using "Fresh-Top Canister" on its price lists before Top Tobacco filed suit. The injunction sought by Top Tobacco, therefore, plainly did not relate to the price lists. Moreover, as North Atlantic points out, Top Tobacco's

damages expert did not even address whether Top Tobacco had suffered injury as a result of the price lists. Rather, he focused entirely on the canisters. In short, the existence of the price lists cannot be used to retroactively buttress the claims that were actually advanced in the litigation. At best, North Atlantic's alleged infringing use of "Fresh-Top Canister" on its price lists was a throw-away issue for Top Tobacco that was just as weak as its claims regarding the canisters.

Top Tobacco now argues for the first time that it has evidence of actual confusion. It has submitted an affidavit from its chairman, Donald Levin, who recounts a conversation he had with a wholesaler at a trade show in Las Vegas in February 2007. According to Levin, the state of Tennessee had issued a document identifying certain tobacco products that could no longer be sold in the state. The list identified several ZIG-ZAG products, including those that used the phrase "Fresh-Top Canister." Levin avers as follows:

> Today, February 22, 2007, at the AWMA "Real Deal" trade show in Las Vegas, Nevada, I was talking with Mr. Charles Enoch, of B & W Wholesale Distributing, Murfreesboro, Tennessee. Mr. Enoch had looked at the de-listing document and asked me, "Are your products being discontinued in Tennessee?" I told him "no," those were not our Top products.

Pl.'s Resp. Ex. K.

The affidavit does not constitute evidence of actual confusion that would bolster the strength of the claims Top Tobacco advanced in this case. First, the conversation occurred a year after Top Tobacco filed suit and after it had lost the case without offering any evidence of confusion. In addition, there are many ways to interpret Enoch's question to Levin. Enoch said nothing about the ZIG-ZIG brand or "Fresh-Top Canister" at all. A perfectly reasonable interpretation is that it simply was a general question about Top Tobacco's products that had nothing to do with ZIG-ZAG. Finally, as discussed above, no matter what Enoch had in mind,

the price list issue still was not part of Top Tobacco's claim for injunctive relief or, apparently, its claim for damages. In short, Levin's belated affidavit is not evidence of actual confusion and does not alter the Court's finding regarding the weakness of Top Tobacco's claims.

Top Tobacco also contends that this is not an exceptional case because it had no choice but to file suit to protect its TOP mark. *See* 2 McCarthy, Trademarks and Unfair Competition § 11:91 (4th ed. 1992) ("The law imposes on trademark owners the duty to be pro-active and to police the relevant market for infringers."). Though true, this does not immunize a trademark owner who filed a baseless suit. Otherwise, every losing Lanham Act plaintiff could claim that his case was not exceptional because he had no choice but to police his mark. Such an interpretation of a trademark owner's duties would read § 1117(a) out of the Act because no case could ever be deemed exceptional.

**b.    Arguments before USPTO**

As discussed above, this case could be deemed exceptional based solely on the sheer weakness of Top Tobacco's claims. *See S Indus.*, 249 F.3d at 627. But there is more. As fully discussed in the Court's January 4, 2007 order, the USPTO initially refused to register Top Tobacco's TOP mark. In response, Top Tobacco stated that

> [h]ere there are not only 13 Cited Marks which incorporate the term "TOP," but an online search of the Trademark Office's records using the TESS system on May 10, 2002, revealed no less than 2,360 live applications and registrations comprised of "TOP." The overwhelming frequency of applications and registrations comprised of "TOP" in the Trademark Office's records coupled with the longstanding coexistence of the Cited Marks, all in Class 34, demonstrates the Trademark Office's recognition that the scope of protection that should be afforded to these marks is *extremely* narrow. The fact that the Trademark Office has granted coexisting registrations for TOP STONE and TOP VALUE, both for cigars . . ., and TOPCO and TOPS, both for book matches . . . further bolsters this point.

Def.'s Summ. Judg. Ex. C at 7 (emphasis in original).[1]  Top Tobacco also told the USPTO that

"where the Cited Marks exist in an extremely crowded field, the marks in question should be

entitled to a comparably narrow scope of protection."  *Id.* at 3.  It continued,

> [t]hus, marks like the Cited Marks which incorporate very common terms such as TOP are entitled to only a very narrow scope of protection, and the addition of any matter which could distinguish one mark from another in sight, sound or meaning, or a slight difference in the goods and services with which the respective marks are used should be sufficient to distinguish one mark from the next for the purposes of avoiding consumer confusion.

*Id.* at 3.  Top Tobacco further argued that

> none of the Cited Marks employ the term 'TOP' in the same or even a similar fashion.  They either use 'TOP' as a superlative describing their product as 'the best' or 'above all others' *or to refer to a lid or closure*.  Accordingly, these differing commercial impressions *weigh strongly in favor of a finding of no likelihood of confusion . . . .*

*Id.* at 7 (emphasis added).

Top Tobacco's statements to the USPTO to convince it to register the TOP mark quite

obviously contradict the positions it took before the Court in this case.  Again, these

inconsistencies are outlined at length in the Court's January 4, 2007 opinion, so only a few

examples will be recited here.  First, Top Tobacco told the USPTO that a mark utilizing "top" to

refer to a lid or closure would not lead to a likelihood of confusion with its TOP brand tobacco

products.  North Atlantic's use of the term "Fresh-Top" refers to the lid on the container.

Second, Top Tobacco told the USPTO that marks utilizing "top" are entitled to a narrow scope

of protection because marks such as TOP STONE and TOP VALUE have coexisted for cigars.

In this case, it argued that TOP was entitled to such broad protection that it could not coexist

---

[1] Class 34, as used in the quoted passage, includes "tobacco, smokers' articles, and matches."

with the phrase "Fresh-Top Canister" affixed in small type to the side of a ZIG ZAG canister. Third, Top Tobacco pointed out to the USPTO that there are many other marks in Class 34 that utilize the word "top." A "humdrum" mark such as "top" cannot achieve fame necessary for dilution protection when so many others use it in a similar field. *See Fruit of the Loom, Inc. v. Girouard*, 994 F.2d 1359, 1363 (9th Cir. 1993).

While before the USPTO, Top Tobacco needed other marks using the word "top" to be given a narrow scope of protection so that it could convince the USPTO to register its TOP mark in the already crowded "tobacco, smokers' articles, and matches" classification. So, it argued as such. In this case, it needed to convince the Court of the diametrically opposite view: that its TOP mark enjoyed broad protection against another user of the word "top" in the tobacco market. So, it simply switched positions. This is not cricket. *See Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427-28 (7th Cir. 1993) ("A litigant is forbidden to obtain a victory on one ground and then repudiate that ground in a different case in order to win a second victory.") Based on Top Tobacco's statements to the USPTO, it is difficult to reach any conclusion other than it had to know before it filed this case that its claims lacked merit. Its change of positions before this Court needlessly increased the costs of defending this suit.

Top Tobacco argues that the Court has taken its statements before the USPTO out of context. Though the Court need not rehash its opinion granting summary judgment, the Court disagrees. The Court reviewed all of Top Tobacco's statements to the USPTO, not just those portions cited in the summary judgment opinion. Top Tobacco was quite clearly telling the USPTO that marks utilizing "top" in Class 34 were entitled to a narrow scope of protection. It also clearly stated that marks utilizing "top" to "refer to a lid or closure" were unlikely to lead to

a likelihood of confusion with other users of "top" in Class 34.

### c. Top Tobacco's litigation positions

The deposition testimony of Top Tobacco's chairman, Donald Levin, further illustrates Top Tobacco's apparent willingness to say whatever it believes suits it at the time and supports a finding that this is an exceptional case within the meaning of § 1117(a). When confronted with the ZIG-ZAG and TOP canisters side-by-side, Top Tobacco's chairman refused to concede the obvious – that they look different. The Court reviewed the testimony on video and could hardly believe that Levin gave the following testimony with a completely straight face:

> Q:     The appearance with the packaging in Exhibit 1 [TOP canister] and Exhibit 2 [ZIG-ZAG Fresh-Top Canister], do you agree with me that the overall appearance of them is very different?
>
> A:     No, as I said, it looks the same. The can looks the same.[2]
>
> ...
>
> Q:     I'm talking about the way that it looks, the words, the colors, the combination of things. Do you agree with me that Exhibit 1, your can, looks very different from Exhibit 2, our can? If you – yes or no?
> ...
>
> A:     No.
>
> Q:     Do you agree with me that the way they look, they're sitting on a counter top or on a shelf, looking at them from the front, they look different?
>
> A:     No. They look the same. They're both cans of tobacco.
>
> ...

---

[2] In the quoted excerpt, if one is quite charitable to Levin, one could conclude that at the outset, he might have intended to refer to the bare cans without the labeling. But it soon became apparent that he intended to say that the overall look of the labeling on the cans was the same, a preposterous contention.

Q: Okay. Forgive me for pushing you on this, Mr. Levin, because I really want to make sure I understand this. In your judgment as the chairman of the company, looking at Exhibit 2 and looking at Exhibit 1, you think they look similar?

A: I think the cans are identical.

Levin Dep. at 105-07, 110. Levin eventually conceded that ZIG-ZAG is a different word than TOP and that the cans are different colors. He refused, however, to budge from his contention that the cans are "identical." This position is similar to looking at the shelves in a library and maintaining that all the books look identical because they are all books, regardless of their titles, jacket designs, and colors. Simply put, Levin's testimony is absurd; it highlights the weakness of Top Tobacco's claims and – like Top Tobacco's inconsistent positions before the USPTO and the Court – demonstrates that Top Tobacco was not playing straight. Moreover, when witnesses dissemble as Levin did, it needlessly increases the costs of defending a suit, one of the factors the Seventh Circuit said courts may consider when deciding whether a case is exceptional. *See S Indus.*, 249 F.3d at 627.

### d. Conclusion

These considerations, taken together, establish that this case is exceptional within the meaning of § 1117(a) and that North Atlantic should be awarded reasonable attorneys' fees. The Court cautions North Atlantic that "reasonable" means exactly what it says and requires that its fee petition reflect the exercise of "billing judgment." *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). In addition, North Atlantic should organize the attorney and paralegal time in its fee petition by activity rather than by date or by attorney.[3] *See In re Continental Illinois*

---

[3] In this regard, North Atlantic should include ABA task codes if North Atlantic's counsel used them for billing purposes.

*Securities Litig.*, 572 F. Supp. 931, 934 (N.D. Ill. 1983). Finally, to the extent time is claimed for multiple attorneys on the same task, North Atlantic will be expected to justify this in its supporting memorandum. The Court admonishes North Atlantic that it will not sift through an unreasonable request to make it reasonable.

In addition, the Court is opting out of the provisions of Local Rule 54.3 to a significant extent, as they are quite cumbersome and, in many cases, lead to undue delay in a court's consideration of a fee request. North Atlantic is to file its fee petition and supporting memorandum by no later than May 7, 2007. On that same date, North Atlantic is to provide to Top Tobacco the materials covered by Local Rule 54.3(d)(1) & (3). Top Tobacco is to file its response to the fee petition by no later than May 29, 2007. If it objects to the amount sought by North Atlantic, it is to produce to North Atlantic on that same date the materials covered by Local Rule 54.3(d)(5). North Atlantic's reply is to be filed by June 8, 2007.

## 2.     Bill of costs

Under 28 U.S.C. § 1920, a court may tax "(1) [f]ees of the clerk and marshal; (2) [f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) [f]ees and disbursements for printing and witnesses; (4) [f]ees for exemplification and copies of papers necessarily obtained for use in the case," among other costs. The Court presumes that the prevailing party is entitled to costs, and "the losing party bears the burden of an affirmative showing that the costs taxed are not appropriate." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 864 (7th Cir. 2005). North Atlantic has submitted a bill of costs in the amount of $139,541.34, comprised of service fees, court reporting fees, printing and witness fees, copying fees, and fees incurred responding to discovery. Top Tobacco objects to

approximately 90% of the costs claimed by North Atlantic.

### a. Service fees

North Atlantic requests $384 for service fees. Top Tobacco raises no objections. The Court therefore taxes these costs to Top Tobacco.

### b. Court reporting fees

#### i. Video deposition costs

North Atlantic claims $26,367.46 for court reporting fees related to transcripts for twenty depositions, and video costs for seventeen of the depositions. The video costs amount to $16,179.13, and the transcript costs amount to $10,188.33. Top Tobacco contends that North Atlantic cannot recover the costs of transcripts and videotapes for the same depositions. Courts may tax the costs of a transcript and a videotape of the same deposition only if both are necessary and reasonable in the context of the particular case. *See Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 448-49 (4th Cir. 1999); *Tilton v. Capital Cities/ABC Inc.*, 115 F.3d 1471, 1478 (10th Cir. 1997); *Rogers v. City of Chicago*, No. 04 C 5569, 2002 WL 423723, at *3 (N.D. Ill. Mar. 15, 2002).

North Atlantic has not argued that the witnesses it videotaped were outside the Court's subpoena power and therefore potentially unavailable for trial. *See, e.g.*, *Nat'l Diamond Syndicate, Inc. v. Flanders Diamond USA, Inc.*, No. 00 C 6402, 2004 WL 1557765, at *2 (N.D. Ill. Jul. 8, 2004). Rather, it cites the benefits of videotape testimony for impeachment at trial and other purposes. Though there is undoubtedly a benefit to having video of a witness's prior testimony (especially a witness like Levin), generally speaking, potential impeachment is not always a proper basis for taxing videotape deposition costs. *See Rockett v. Marten Transp., Ltd.*,

No. 99 C 3957, 2002 WL 54545, at *1 (N.D. Ill. Jan. 15, 2002) ("If defendants want that impeachment 'edge,' however, they must pay for it themselves."). This Court has rejected requests for costs of transcripts and video recordings for the same deposition for precisely this reason. *See Engate, Inc. v. Esquire Deposition Svcs, LLC*, No. 01 C 6204, 2006 WL 695650, at *2 (N.D. Ill. Mar. 13, 2006). This case, however, is different. The videotape of Levin's deposition was not merely useful for impeachment; with the videotape in its arsenal, North Atlantic likely would have eviscerated Levin at trial. Because Levin is Top Tobacco's chairman, it is hard to overestimate the potential impact of the videotape on a jury. The cost of videotaping Levin's deposition, therefore, was reasonable and necessary. With regard to the other seven depositions taken by North Atlantic for which it seeks video costs, North Atlantic has not provided any support for departing from the general rule that a party may not recover both video and transcript costs. The Court therefore taxes Top Tobacco $1,367.63 for video costs related to Levin's deposition.

Nine of the depositions for which North Atlantic seeks video costs were noticed and taken by Top Tobacco. Top Tobacco is the party that decided to video tape these depositions and bore the lion's share of the expense. For these nine depositions, North Atlantic is only seeking the costs incurred to receive a copy of the video tape. Knowing that its opponent possessed video tapes of these depositions, it was reasonable and necessary for North Atlantic to obtain copies. In such a hotly contested case, North Atlantic would have been ill-advised not to do so. The Court taxes Top Tobacco $3,483.50 for video costs related to the nine depositions taken by Top Tobacco.

### ii. Expedited transcripts

Top Tobacco also contends that North Atlantic cannot recover costs associated with obtaining expedited deposition transcripts. The expedited transcripts cost $4.40 per page instead of the standard $3.30 per page, resulting in an additional cost of $2,187.90. North Atlantic contends that expedited transcripts were necessary because depositions were often scheduled simultaneously or on back-to-back days, due to an expedited discovery schedule, and many Top Tobacco witnesses deferred questions to other witnesses. Therefore, North Atlantic argues, it needed the transcripts to prepare for the immediately upcoming depositions of later witnesses.

According to North Atlantic's bill of costs, it took eight depositions of Top Tobacco witnesses and ordered the transcripts at the expedited rate. It took the depositions on the following dates: two on July 12, 2006, and one each on July 13, 2006, July 14, 2006, August 22, 2006, August 30, 2006, September 7, 2006, and September 13, 2006. The July 14, 2006 and September 13, 2006 transcripts plainly did not need to be ordered at an expedited rate because North Atlantic was not deposing any Top Tobacco witnesses shortly after July 14, 2006, and the September 13, 2006 deposition was its last. Those deposition costs will be taxed at the standard rate of $3.30 per page. The remaining depositions were scheduled sufficiently close to the depositions of other Top Tobacco witnesses that it was reasonable and necessary to order expedited transcripts. The Court therefore taxes $9,682.33 to Top Tobacco for deposition transcripts.

### c. Witness costs

### i. Witness attendance fees and travel costs

North Atlantic requests $2,024.40 for witness attendance fees and travel costs. Top

Tobacco raises no objection.  The Court therefore taxes these costs to Top Tobacco.

ii.    **Expert discovery costs**

A court may also tax certain expenses incurred responding to expert discovery.  Fed. R.

Civ. P. 26(b)(4)(C).  Rule 26(b)(4)(C) provides that "[u]nless manifest injustice would result . . .

the court shall require that the party seeking discovery pay the expert a reasonable fee for time

spent in responding to discovery . . . ."  This allows recovery only for time spent preparing for

and attending depositions.  *See Nilssen v. Osram Sylvania, Inc.*, No. 01 C 3585, 2007 WL

257711, at *4 (N.D. Ill. Jan. 23, 2007).

North Atlantic requests $43,698 that it spent responding to expert discovery.  Top

Tobacco objects to the imposition of expert costs because, it contends, North Atlantic did not

provide invoices from its experts sufficient to show the time they spent preparing for and

attending their depositions, as opposed to other tasks.  North Atlantic attaches to its bill of costs

invoices for its three expert witnesses.  It seeks $17,050 for Walter McCullough, $10,000 for

Marian Moore, and $16,648 for Lisa Stamm.  McCullough's invoice describes the services he

rendered as "reading other expert reports, phone calls with attorneys, reviewing all documents

relating to the case, preparing documents for discovery, traveling to Chicago to have my

deposition taken, and subsequent examination of document for various issues raised in my

deposition."  Bill of Costs, Ex. E.  He billed thirty-two hours for these services.  He did not,

however, itemize how much of the thirty-two hours was spent preparing for his deposition.

Based on the complexity of the issues and the detailed nature of the consumer survey about

which he testified, the Court believes that a ratio of twice the length of the deposition is a

reasonable time for preparation.  According to Top Tobacco (and undisputed by North Atlantic),

McCullough's deposition lasted less than three hours. The Court taxes Top Tobacco with $4,500 in costs for the time McCullough spent preparing for and attending his deposition (McCullough's hourly rate of $500 multiplied by six hours for preparation, plus three hours for the deposition).

Marian Moore's invoice also does not specify precisely how much time she spent preparing for and attending her deposition. Her deposition lasted four hours. The Court taxes Top Tobacco with $6,000 in costs for the time she spent preparing for and attending her deposition (Moore's hourly rate of $500 multiplied by eight hours for preparation, plus four hours for the deposition). Lisa Stamm's invoices are similarly vague. Her deposition lasted six hours. The Court taxes Top Tobacco with $8,910 in costs for the time she spent preparing for and attending her deposition (Stamm's hourly rate of $495 multiplied by twelve hours for preparation, plus six hours for the deposition).

In sum, the Court taxes Top Tobacco $19,410 for costs spent responding to expert discovery.

### c. Copying and exemplification costs

North Atlantic requests $62,630.72 for photocopying, $706.85 for sequential numbering of documents, and $3,729.91 for obtaining trademark registrations and file histories.

#### i. Sequential ("Bates") numbering

Top Tobacco does not object to the sequential numbering costs, and thus the Court taxes this cost to Top Tobacco.

#### ii. Photocopying costs

A prevailing party may recover photocopying costs for those documents provided to the

court or the other parties, but not for those made for its own convenience. *See McIlveen v. Stone Container Corp.*, 910 F.2d 1581, 1584 (7th Cir. 1990). Top Tobacco contends that much of North Atlantic's claimed copying costs are not taxable because it produced only 5,000 pages of documents during discovery. Therefore, Top Tobacco argues, there is no way North Atlantic could have incurred $62,630.72 in taxable copying charges. Indeed, North Atlantic seeks to recover for *568,607* black and white copies; this is the equivalent of well over one hundred copies of every piece of paper it produced in discovery. Although the parties' submissions to the Court were often voluminous, thankfully were not *that* voluminous.

The Court acknowledges, as North Atlantic points out, that a prevailing party is not required to submit a description "so detailed as to make it impossible economically to recover photocopying costs." *Northbrook Excess and Surplus Ins. Co. v. Proctor & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991). But it is reasonable to expect a party seeking over $62,000 in photocopying costs to put *some* effort into explaining, at least in general, what was copied. North Atlantic, however, has provided the Court with no justification for its request, other than to say this was a big case. That is insufficient.

For these reasons, the Court will tax photocopying costs for 15,000 pages relating to discovery (one set of discovery documents produced to Top Tobacco, one set for use at depositions, and one set for North Atlantic's attorneys, which the Court finds was reasonable and necessary), and for 3,000 pages of pleadings, motions, and exhibits submitted to the Court and served on Top Tobacco. The latter figure is concededly a rough estimate. Because this case involved trademarks whose color was relevant, the Court will also tax costs related to 500 color copies (as opposed to the almost 4,000 for which North Atlantic seeks reimbursement).

In sum, the Court taxes Top Tobacco $2,505 in copying costs (18,000 copies at $0.10 per page, and 500 color copies at $1.41 per page).

### iii. Trademark registrations

Top Tobacco appears to agree that North Atlantic may recover costs incurred to obtain Top Tobacco's trademark registrations and file histories. It contends, however, that the invoices provided by North Atlantic do not support North Atlantic's claim that it incurred all these costs to obtain registrations and file histories for plaintiffs' trademarks. Rather, some of the invoices appear to relate to other third-party trademarks and certain cancellation and opposition proceedings. In this case, due to Top Tobacco's prior representations to the USPTO, official documents other than plaintiff's trademark registrations were relevant. The Court has reviewed the invoices provided by North Atlantic and concludes that they provide adequate backup for its request. The Court taxes Top Tobacco $3,729.91 for trademark registrations and file histories.

## Conclusion

For the reasons stated above, the Court grants defendants' motion for attorneys' fees [docket no. 100] and grants in part and denies in part its bill of costs [docket no. 107]. The Court taxes costs in favor of defendants in the amount of $43,293.62. Defendants are ordered to file their fee petition by May 7, 2007; plaintiffs shall respond by May 29, 2007. Defendants may file a reply by June 8, 2007. The Court will rule by mail.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 17, 2007